ATLAS MUTUAL BENEFIT ASSOCIATION, a Delaware Corporation, formerly The Capitol Mutual Benefit Association of Delaware, which were successors to The Capitol Mutual Benefit Association of Denver, Colorado, a Foreign Corporation, Defendant Below, Plaintiff in Error, v. HELEN PORTSCHELLER, Plaintiff Below, Defendant in Error.

(*June* 11, 1945.)

HARRINGTON, Chancellor, LAYTON, C. J., and SPEAK-MAN, J., sitting.

*Clair J. Killoran* for the Plaintiff in Error.

*Collins J. Seitz* and *Southerland, Berl and Potter* for the Defendant in Error.

Supreme Court, February Session, 1945.

LAYTON, Chief Justice:

In 1934, The Capitol Mutual Benefit Association, a corporation of Colorado, predecessor to the plaintiff in error, upon the application of one Peter Portscheller, issued to him a certificate of insurance by which it agreed, upon his death, to pay to Helen Portscheller, the defendant in error, a certain amount of money, not exceeding $1,000.00. The insured died; the association declined to pay the stipulated benefits; and the beneficiary sued the association in the Circuit Court of Wayne County in Chancery, in the State

of Michigan. Service of process was made on the Secretary of State of Michigan under a statute providing that upon the failure of a corporation to appoint and maintain a resident agent and to file a certificate of appointment as by law required, process might be served on the Secretary of State. Sec. 14092, *Comp.Laws*, 1929, as amended by Act No. 195, *Public Acts*, 1933. On March 5, 1941, a default decree was entered in favor of the defendant in error against the association in the sum of $542.50, and this decree was the basis of the suit against the defendant below.

The cause was heard upon a stipulation of facts, and exhibits, consisting of a form of certificate issued to the insured and the by-laws of the Colorado association. It was stipulated that the association authorized one Koch to solicit applications for insurance in the State of Michigan and supplied him with its printed forms of application, and printed forms of receipts; that Koch solicited in Michigan Peter Portscheller, the husband of the plaintiff below, who on September 10, 1934, signed an application for membership and paid to Koch the sum of $6.00; that of this amount Koch retained $4.00 as his commission, and forwarded to the association at its office in Denver, Colorado, the signed application and a receipt, together with the sum of $2.00, of which $1.00 represented an application fee, and $1.00 a contribution for the first month's benefit; that Koch also solicited and obtained the application for membership in the association of one other person, a resident of Michigan, likewise receiving, receipting and accounting for the sum of $6.00 paid by the applicant; that Koch failed to obtain any other applications for membership although he solicited numerous other persons in Michigan for a period of approximately thirty days, after which time he had no further connection with the association; and that at the time of the death of the insured he was in good standing

with the association, having in his lifetime paid all of the required contributions.

It was further stipulated that, with respect to a foreign corporation, the laws of the State of Michigan did not define what constituted doing business in the State; and, further, that the judgment of the Michigan Court sued upon was a legally valid and binding judgment upon the defendant below, if the Court should determine from the facts stipulated that the defendant's predecessor was doing business in the state so as to subject itself to the process of the Michigan Court on or about September 10, 1934, when the certificate of insurance was issued.

The certificate of insurance was executed by the association at its home office in Denver, Colorado. The by-laws of the Association were incorporated in and made a part of the certificate. The association's promise to pay benefits was made in consideration of the membership fee and of the contents and representations in the application for membership. All payments of benefits were conditioned upon full performance of the member in making his payments, time being of the essence, and the receipt at the home office determined all questions of time.

It was provided by the by-laws that, to become a member, the applicant and beneficiaries must be of good moral character, in good health, free from any disease or disability, and not over eighty years of age; that an applicant might apply for membership by signing an application and paying in advance the required membership fee and one regular monthly payment of $1.00, receivable at the home office before midnight of the last day of the calendar month; that the certificate of insurance was based on the truth of the warranties contained in the application, which was required to be signed personally by the applicant; that all

payments made by members were voluntary contributions for the purpose of aiding members of the association and to take care of its expenses, and every member, upon receipt of notice of the date and amount of his voluntary pledge, must forward the amount to the home office in Denver; and that, in case of death the beneficiary must, within thirty days, notify the Secretary, and accompany the notice with proof of death in such form and detail as the association might require.

No agent was empowered to make or modify a certificate of membership, or to bind the association by making any promise or representation. It was the duty of the Secretary-Treasurer, inter alia, to give notice of all death claims, to issue and sign all vouchers, and to look after the payment of all benefit claims. Members were required to notify the Secretary of any change of address, failing which a notice mailed to the last known address was to be considered as a lawful notice.

The sole question presented to the Court below was whether, under the stipulated facts, the defendant's predecessor was "doing business" in the State of Michigan on or about September 10, 1934, so as to be answerable to the process of the Michigan Court.

The Court below, in an opinion reported in 38 A.2d 607, Judge Terry dissenting, answered the question in the affirmative. Judgment was given for the plaintiff. This writ of error followed; and the assignments of error challenge the correctness of the decision of the Court below, and assert that the decree of the Michigan Court, if enforced, would deprive the plaintiff in error of the benefit of due process of law under Section 1, Article XIV of the Federal Constitution as amended.

We find ourselves in disagreement with the decision of the trial Court.

■■ We quite agree, as reiterated in the majority opinion below, that a decision was required upon somewhat insufficient facts; but we must reject the suggestion that the association had activities in the State of Michigan other than those of its admitted agent, Koch, for the reason that there is nothing in the record to indicate otherwise. The burden of proof was on the plaintiff to show by what authority the Michigan Court could legally enter a personal judgment against the defendant association, a corporation of another state, in the absence of personal service upon it, or appearance personally or by an attorney of its own selection. *Old Wayne Mutual Life Association v. Mc-Donough,* 204 *U.S.* 8, 27 *S.Ct.* 236, 51 *L.Ed.* 345. Moreover, it was stated on behalf of the plaintiff in error at the oral argument, and not denied, that the stipulation contained all of the facts known to the parties. The factual situation must be accepted as it appears, and nothing can be conjectured to the disadvantage of the defendent below.

■ We disagree with the trial Court in its holding ·that, as no express place of payment of loss was mentioned in the policy, the loss was payable in Michigan. *Bothwell v. Buckbee-Mears Co.,* 275 *U.S.* 274, 48 *S.Ct.* 124, 72 *L.Ed.* 277, cited by the court in support of its statement, referred, in turn, to *Pennsylvania Lumberman's Mutual Fire Insurance Co. v. Meyer,* 197 *U.S.* 407, 25 *S.Ct.* 483, 486, 49 *L.Ed.* 810; and it may be assumed that there was no intention to depart from the rule announced in that case where, upon the question whether a debtor must follow his creditor out of the state where the contract was made in order to pay, or make tender of payment of the debt, it was said "that depends upon the contract, and what inference of the place of payment may be drawn from its contents, when it does not state in so many words where payment is to be made." *Weyand v. Park Terrace Co.,* 202 *N.Y.* 231, 95 *N.E.* 723,

725, 36 *L.R.A.* (*N.S.*) 308, *Ann.Cas.* 1912D, 1010, 1014, a leading case, lays it down that "While it is a rule of general acceptation that a debtor must seek his creditor to pay his indebtedness, it is always open to the parties to show by the express terms of the contract or by fair inference therefrom that it was the intention of the parties to pay at a particular place or within a particular state or country. The state or country in which the contract is made has an important or perhaps controlling bearing in determining whether a debtor is required to go beyond the bounds of the state or country of his residence to make payments upon the contract." This language has been incorporated in the text in 6 *M.C.L.* 902, which, in turn, has been widely cited. See *Burr v. Western States Life Insurance Co.*, 211 *Cal.* 568, 296 *P.* 273. The rule, as stated in 2 *Beale, Conflict of Laws,* 1259, is substantially the same. In *Minnesota Commercial Men's Association v. Bean*, 261 *U.S.* 140, 43 *S.Ct.* 293, 67 *L.Ed.* 573, the appellant was a mutual accident and health association doing business usually by mail, and apparently much in the same manner as the association here; and it was held that the contract of insurance was a Minnesota contract, made and performable in Minnesota, and not in Montana where the insured lived. See also *Bottomley v. Metropolitan Life Insurance Co.*, 170 *Mass.* 274, 49 *N.E.* 438. In the case under review the contract was made in Colorado, and having regard for the nature of the association, its manner of doing business, and the several provisions of its by-laws which were made a part of the contract, every fair inference points to the home office of the association in Colorado at the place contemplated by the parties as the place of payment of benefits.

The business of insuring lives is, of course, different from that of supplying goods or services. It is quite true that a contract of life insurance initiated by the

solicitation of an agent may be long-lived; but we see no sufficient reason why a court should put a life insurance company in an excepted class and hold it to be present in a state so as to be amenable to process upon proof of solicitation of business alone, when a farm machinery company or a transportation company, for example, would not, in like circumstances, be considered to be present in the state. No doubt it is more convenient for the beneficiary under a contract of life insurance to sue to enforce it in the state of his residence, as in the case of many contracts; but we do not agree that the essentials of corporate presence in a state are necessarily to be disregarded in favor of those who are characterized by the trial court as "persons of most moderate means holding small policies of insurance in foreign companies." Reasonableness is a question not to be determined from the viewpoint of the individual member of a protective association or his beneficiary. We cannot say that a mutual insurance association of the kind here, enabled to furnish its members with a low cost insurance by the elimination of much of the usual expense incident to the business, does not serve a social need; and having regard for the particular and like beneficial associations, depending as they do on moderate contributions or assessments for the payment of benefits, it may be seriously doubted whether the subjection of such associations to the expense of suits in far-off states would not work to the disadvantage of the memberships as a whole, an incident to which the individual inconvenience or apparent hardship should properly give way. See *Tomlinson v. Iowa State Travelling Men's Association*, (*D. C.*) 251 *F*. 171.

■ . And finally, we think, questions relating to due process of law under the Federal Constitution should be resolved in accordance with decisions of the Supreme Court of the United States and other federal courts, rather than

with decisions of state courts which are frequently based upon local statutes. See *Pembleton v. Illinois Commercial Men's Association*, 289 *Ill.* 99, 124 *N.E.* 355; *Hinchcliffe Motors Inc. v. Willys-Overland Motors*, (*D. C.*) 30 *F. Supp.* 580.

■ ■ A foreign corporation is amenable to process to enforce a personal liability, in the absence of consent, only if it is doing business within the state in such manner and to such extent as to warrant the inference that is present there. *Philadelphia & Reading Ry. Co. v. McKibbin*, 243 *U.S.* 264, 37 *S.Ct.* 280, 61 *L.Ed.* 710; *Bell v. Viavi Co.*, 4 *W.W.Harr.* (34 *Del.*) 76, 143 *A.* 255, rehearing denied, 4 *W.W.Harr.* (34 *Del.*) 176, 146 *A.* 605. This is no more than a reiteration of an earlier statement by the Supreme Court that it has decided each case of this character upon the facts before it, and has laid down no all-embracing rule by which it may be determined what constitutes the doing of business by a foreign corporation in such manner as to subject it to a given jurisdiction. *Davega, Inc., v. Lincoln Furniture Mfg. Co., Inc.*, (2 *Cir.*) 29 *F.* 2d 164.

■ Corporate presence in a state as the basis of subjection to process rests, we think, upon the continuity and extent of business actually done within the state and not merely put in motion there. The word "present," as used in the pronouncement of the Supreme Court, is a cryptogram. It is used, not literally, but as suggestive of something else. Taken literally, it would admit of the argument that a corporation is required to defend any controversy arising out of a transaction entered into where the suit was brought; but this would impose too severe a burden. There must be some continuity of business activity on the part of the corporation in the State of the forum, "enough to demand a trial away from its home." This is the important, if not controlling, consideration expressed shortly by the

word "presence," but "involving an estimate of the inconveniences which would result from requiring it to defend, where it has been sued." The inquiry, then, is whether the extent and continuity of what it has done in the state in question makes it reasonable to bring it before one of its courts. *Hutchinson v. Chase & Gilbert Inc. et al.,* (2 *Cir.*) 45*F.*2d 139. Implicit in the synthesis is the necessity for inquiry into the kind of business activity carried on by the corporation. The solicitation of business in a given state is, of course, a business activity of a kind. Such an act is preliminary to the doing of business. But, as a general proposition, the test is, not the solicitation of business merely, but whether the agent has authority to carry forward or to conclude business transactions in the state. *Peebles v. Chrysler Corporation,* (*D.C.*) 57 *F.* 2d 867; *Hinchcliffe Motors, Inc., v. Willys-Overland Motors, supra,* 30 *F. Supp.* at page 583.

Presence in a state manifested by business actually done there, as opposed to solicitation of business, as a basis of amenability of a foreign corporation to local process is inherent in the decision in *International Harvester Co. v. Commonwealth of Kentucky,* 234 *U.S.* 579, 34 *S.Ct.* 944, 58 *L.Ed.* 1479, for there the emphasis was placed on the authority of the corporate agents, not only to solicit orders for farm machinery, but also to receive payment therefor in money, checks, drafts, or notes payable and collectible at Kentucky banks. The same may be said of *Pennsylvania Lumberman's Mutual Fire Insurance Co. v. Meyer, supra,* where the appellant, a Pennsylvania corporation, summoned to defend in New York, solicited its business largely by mail, but had about one-third of its total fire risks in the state of New York, amounting to approximately $900,000, and its practice was to send its adjusters into that state for the purpose of adjusting losses. Such acts were character-

ized by the court as within the contemplation of the company, and necessary to be done to carry out the provisions of its contracts. Likewise in *St. Louis Southwestern R. Co. of Texas v. Alexander*, 227 *U.S.* 218, 35 *S.Ct.* 245, 57 *L.Ed.* 486, *Ann.Cas.*1915B, 77, the corporation maintained an office in the city of New York, and a general agent with authority to make settlement of claims. On the other hand, in *People's Tobacco Co. v. American Tobacco Co.*, 246 *U.S.* 79, 38 *S.Ct.* 233, 62 *L.Ed.* 587, *Ann.Cas*1918C, 537, it was expressly pointed out that the corporation's agents in Louisiana had no authority beyond solicitation, and that much activities, under the law as settled by previous decisions, did not amount to that doing of business which would subject the corporation to the local jurisdiction for the purpose of service of process upon it.

These decisions of the Supreme Court of the United States, referred to by the trial court, do not support its position, and, indeed, they may have been cited generally, and not for any specific application.

The federal authority mainly relied upon was *Sparks v. National Masonic Accident Association*, (8 *Cir.*) 73 *F.* 277. There the defendant, an Iowa corporation, was subjected to the process of a Missouri Court by service made on the Insurance Commissioner of the State. A default judgment was obtained which was sued upon in Iowa. Upon the facts of the case it was held that the defendant had been transacting business in Missouri within the meaning of the statute. The general agent and a soliciting agent of the association had been in Missouri for about two months engaged in soliciting insurance in several towns. Sixty-six applications for insurance were obtained upon which the defendant issued membership certificates. Ten of the applications were procured by the general agent, among them that of the plaintiff's husband. All applications were sent

to the home office in Iowa where membership certificates were executed and mailed to the applicants. The general practice, however, was for members to pay dues or assessments to some person in their home town who acted as collector for the defendant, and who collected, receipted for and remitted to the defendant at its home office the amounts so collected. Whatever may be said of the case having in mind the extent and continuity of business actually done in the State of the forum as indicative of corporate presence there, it is distinguishable from the case before the Court. Some business in furtherance of completed contracts was actually done in the state. Moreover the case was decided in 1896, long before the decisions of the United States Supreme Court to which reference has been made, and the only authority cited in support of the decision was concededly not "on all fours." What influence the fact that the defendant's general agent was in the State engaged in soliciting and procuring applications for insurance, among them the application of the plaintiff's husband, had upon the court, is not known, but emphasis was given to the fact that the general agent was chosen from the membership of the board of directors, and much of the opinion was devoted to a recitation of his authority to appoint and remove local and soliciting agents and his duty to exercise a watchful care over them and to direct and control their efforts so as to be most beneficial to the association.

*McNeeley v. Fidelity Mutual Benefit Association*, 178 *S.C.* 247, 182 *S.E.* 425, *Merchants & Bankers Guaranty Co. v. Washington*, 185 *Okl.* 532, 94 *P.*2d 930, 137 *A.L.R.* 1123, *Dixon v. Northwestern National Life Ins. Co.*, 189 *Iowa* 1268, 179 *N.W.* 885, *Union Mutual Life Co. v. Bailey*, 99 *Colo.* 570, 64 P.2d 1267, and *State v. United States Mutual Accident Association*, 67 *Wis.* 624, 31 *N.W.* 229, in varying circumstances and under local statutes, may be said to sup-

port generally the decision below. In two of the cases the facts are meagerly reported; in one of them the question of due process of law was not raised; in the last cited case the local agent made delivery of contracts of insurance and advertised the defendant's business in the State; and none of them relied on decisions of the Federal Courts.

In addition to the decisions cited by the trial court, the appellee offers others.

*Hoopeston Canning Co. et al. v. Cullen*, 318 *U.S.* 313, 63 *S.Ct.* 602, 87 *L.Ed.* 1722, 145 *A.L.R.* 1113, seems to have been cited for some expressions in the opinion with respect to the theory that a state may have a substantial interest in the business of insurance regardless of what was termed the "isolated factors" of the place of contracting or place of performance. The appellants were reciprocal insurance associations insuring against fire and related risks with attorneys-in-fact located in Illinois. During a period of years the reciprocals seem to have been annually licensed to do business in New York, and had executed over 50,000 contracts affecting risks in that State, with gross premiums of over $2,000,000.00. The issue was whether the appellants might constitutionally be made subject to the regulatory statutes of state. The facts of the case, in essence, were the same as those in *Pennsylvania Lumberman's Mutual Fire Insurance Co. v. Meyer, supra*. The case of *Commercial Mutual Accident Co. v. Davis*, 213 *U.S.* 245, 29 *S.Ct.* 445, 53 *L.Ed.* 782, involved the sufficiency of service of process in an action in a Missouri Court against a Pennsylvania corporation, under a statute which authorized summons against an insurance company not incorporated or authorized to do business in the state, by delivering a copy to any person within the state who, on behalf of the insurance company, should, inter alia, adjust or settle or pay a loss. With knowledge of the statute imputed to it the company sent

into the state a representative with authority to adjust and settle the appellee's loss, and service of process was made upon him. The facts of the case do not appear in the opinion, other than that the company had other policies outstanding in the state. The court was content to say that the finding of the court that the defendant was doing business in Missouri was supported by testimony. *Frene v. Louisville Cement Co.*, 77 *U.S. App.* (*D.C.*) 129, 134 *F.* 2d 511, decided by a divided court, was a case where the majority of the court were clearly of opinion that the defendant's agent in the District of Columbia was, with the knowledge and approval of his principal, doing far more than merely soliciting business.

*Minnesota Commercial Men's Association v. Benn*, 261 *U.S.* 140, 43 *S.Ct.* 293, 67 *L.Ed.* 573, cited by the appellee, will be noticed later. Other decisions of state courts, likewise cited, have been examined and have been found to be either distinguishable on the facts or not persuasive.

The appellant relies strongly upon *Old Wayne Mutual Life Association v. McDonough, supra,* and *Green v. Chicago Burlington & Quincy R. Co.*, 205 *U.S.* 530, 27 *S.Ct.* 595, 51 *L.Ed.* 916. The first case involved a default judgment obtained in Pennsylvania, service having been made on the Insurance Commissioner. The judgment was subsequently sued on in Indiana, where the association was domiciled, and judgment was obtained. The plaintiffs were citizens of Pennsylvania, and were beneficiaries under an insurance policy issued on the life of a Pennsylvania citizen by the defendant association. To what extent and how the association operated in Pennsylvania do not appear. Probably as suggested in *Farmers' & Merchants' Bank of Catlettsburg, Ky. v. Federal Reserve Bank*, (*D.C.*) 286 *F.* 566, 608, the association sent its agent into Pennsylvania to solicit the application which was forwarded by him to the home

office in Indiana and there accepted by it, thus making it an Indiana contract. At any rate the declaration in the Pennsylvania suit alleged that the association had been doing business in certain counties in Pennsylvania for many years issuing policies of life insurance to numerous and divers residents. Conceding that by going into Pennsylvania, without first complying with its statute, the defendant might be held to have assented to the service upon the insurance commissioner of process in a suit brought against it there in respect of business transacted there, the court was of opinion that such assent could not properly be implied where it affirmatively appeared that the business was not transacted in Pennsylvania, as the Pennsylvania statute was directed against insurance companies who did business in that commonwealth. Said the Court, "While the highest considerations of public policy demand that an insurance corporation, entering a state in defiance of a statute which lawfully prescribes the terms upon which it may exert its powers there, should be held to have assented to such terms as to business there transacted by it, it would be going very far to imply, and we do not imply, such assent as to business transacted in another state, although citizens of the former state may be interested in such business." [204 U.S. 8, 27 S.Ct. 241] The judgment of the Indiana Court was reversed for the reason that the Pennsylvania Court was without jurisdiction. The trial Court dismissed the case with the comment that the Supreme Court simply placed a strict construction upon the Pennsylvania statute.

In the Green case, the plaintiff sued the defendant railway company, a corporation of Iowa, in Pennsylvania, to recover damages for personal injuries sustained in Colorado. Service of process was made upon the defendant's agent, Heller. The validity of the service depended on whether the corporation was doing business in Pennsyl-

vania in such a manner and to such an extent as to warrant the inference that, through its agents, it was present there. For the purpose of soliciting business for its line that extended westward from Chicago, Illinois, the defendant employed Heller as its agent, hired an office for him, designated him as district freight and passenger agent, and otherwise advertised the facts. The agent's business was to solicit and procure passengers and freight to be transported over the defendant's line. Servants and agents were employed who acted under Heller's direction. He sold no tickets and received no payments. The course of the activity was for the agent to take the applicant's money and to procure from one of the railways running west from Philadelphia a ticket for Chicago and a prepaid order, which gave to the applicant upon his arrival at Chicago, the right to receive from the defendant a ticket over that road. Occasionally he sold to railroad employees, who already had tickets over intermediate lines, orders for reduced rates over the defendant's lines. In some cases, for convenience of shippers who had received bills of lading from the initial line for goods routed over the defendant's lines, he gave in exchange therefor bills of lading over the defendant's lines, the bills of lading reciting that they would not be in force until the freight had been actually received by the defendant. Obviously, said the Court, the defendant was doing in Pennsylvania considerable business of a certain kind although there was no carriage of freight or passengers; but the business was no more than solicitation, and insufficient to make the defendant amenable to process in the state of Pennsylvania.

The trial court declined as it seems to accept the decision as controlling, and cited criticisms of it by inferior Federal Courts. In the Harvester Company case, however, the Court expressly said that it had no desire to depart from the decision, although it referred to it as an "extreme

case"; and since that decision, the Supreme Court and lower Federal Courts of the highest standing have given it respect.

In *Minnesota Commercial Men's Association v. Benn, supra,* the association, a Minnesota corporation, was sued in Montana. A default judgment was obtained which, thereafter, was sued upon in Minnesota. The plaintiff prevailed in the trial and Supreme Courts. The association's method of transacting its business was quite similar to that of the association here, except that solicitation of business in other states was by members of the association who received no compensation other than occasional premiums or prizes. It was held, reversing the Minnesota Supreme Court, that the facts failed to disclose any evidence that the petitioner was doing business in Montana within the proper meaning of the words, and that the Montana Court was without jurisdiction.

*Tomlinson v. Iowa State Traveling Men's Association, supra, Baldwin v. Iowa State Traveling Men's Ass'n,* (8 Cir.) 40 *F.* 2d 357, *Oliver v. Iowa State Traveling Men's Ass'n,* (8 Cir.) 76 *F.* 2d 963, *Sasnet v. Iowa State Traveling Men's Ass'n,* (8 Cir.) 90 *F.* 2d 514, and *Pembleton v. Illinois Commercial Men's Association, supra,* upon substantially similar facts, are in accord.

Other decisions cited by the appellant and which are found to be in general support of its contention are *Hussey. Tie Co. v. Knickerbocker Insurance Co.,* (8 Cir.) 20 *F.* 2d 892; *Kasprzak v. Mutual Life Assurance Co. of Canada,* (D.C.) 1 *F. Supp.* 915, and *Rausch v. Commercial Travelers' Mutual Accident Association,* (8 Cir.) 38 *F.* 2d 766.

In *Davega, Inc., v. Lincoln Furniture Mfg. Co., supra,* suit was brought in a New York State Court and from thence removed to the Federal Court. The defendant was a manufacturer of furniture at Bristol, Va. It had a solicitor

in New York at an office of the defendant where its name was displayed and where samples were kept. The solicitor obtained orders amounting to about $200,000 a year on a commission to him of 6% or 5% depending on whether the order was for less or more than a car load, the commission payable regardless of collections. Sometimes he attempted to collect overdue accounts, and made adjustments of accounts subject to the approval of the company. Sometimes he sold sample furniture at the list price, or extended credit where he knew the account was acceptable. Sales of samples amounted to only $1000 a year or ½ of one percent of the solicitor's volume of business. The defendant's president went to New York four or five times a year, and its vice-president about six times. They discussed matters with the solicitor and endeavored to adjust accounts while there. The Vice-President solicited orders for radio cabinets, and the cause of action arose over an order for 5000 cabinets, a memorandum of which was mailed to Virginia from whence an acceptance in writing was forwarded. Upon a review of the facts the court was of opinion that, while the case was close, the defendant was not doing business in the State of New York.

As has been said, the case under review is similar in its facts to the Benn case, except that here the soliciting agent was compensated by way of a small commission. The circumstance, while not to be wholly disregarded, is not, we think, of controlling importance. An insurance association encouraging its members to solicit insurance for it stands, it would seem, pretty much in the same position so far as concerns doing business in a state as an association which compensates its solicitors. In either case business is put in action, and the activities, whether regularly or irregularly compensated, enure to the benefit of the association. In the Harvester Company case, the Green case,

the Davega, Inc., case, the Hinchcliffe Motors, Inc., case, and in *W. S. Tyler Co. v. Ludlow-Saylor Wire Co.*, 236 *U.S.* 723, 35 *S.Ct.* 458, 59 *L.Ed.* 808, the agents were compensated, but the fact was not particularly noticed

There is presented the case of a Colorado corporation sued in the State of Michigan upon a contract of insurance made and performable in Colorado and sought to be made amenable to special statutory process in Michigan on the theory that it was doing business there in such manner and to such extent as to infer its presence there, upon an affirmative showing that it was represented in Michigan for about thirty days by a soliciting agent with no authority to conclude a contract or to bind the association in any way, or upon the completion of a contract in any way to act for it, during which short period of time the agent solicited numerous persons, but succeeded in obtaining only two applications for membership, he, in each case, retaining a commission. Except for the fact of compensation, which is not of paramount importance, there is an entire absence of those factors which some of the authorities, at least, seem to regard as significant in determining the question of corporate presence. There is nothing in the record to show that the association ever had an office in Michigan, or displayed a sign there, or advertised its business there; or that any contribution or assessment was ever paid in Michigan to any representative except the two initial payments to the agent, Koch, which were not in furtherance of completed contracts; or that the association ever investigated or settled a claim for benefits in Michigan either through a local agent or through a representative sent there for the purpose; or that it ever had in Michigan an agent with authority to bind it in any way. In the circumstances shown we agree fully with the conclusion announced in the dissenting opinion below that the activities of the defend-

ant's predecessor in the State of Michigan amounted to no more than solicitation, and that it was not present in that State on or about September 10, 1934, in such manner as to be subject to the local process.

The Michigan Court was without jurisdiction over the defendant's predecessor, and its judgment, sued on below, was not entitled to faith and credit. It follows that the judgment of the Court below must be reversed with the direction that judgment be entered for the defendant.

Reversed and remanded, with direction to enter judgment for the defendant.